973 So.2d 380 (2007)
Jimmy L. BROOKS, Jr.
v.
STATE of Alabama.
CR-03-1113.
Court of Criminal Appeals of Alabama.
March 2, 2007.
Certiorari Denied May 18, 2007.
*385 Jeffery C. Duffey, Montgomery, for appellant.
*386 Troy King, atty. gen., Kevin C. Newsom, deputy atty. gen., and Jasper B. Roberts, Jr., asst. atty. gen., for appellee.
Alabama Supreme Court 1060844.

On Applications for Rehearing
SHAW, Judge.
The opinion issued on June 30, 2006, is withdrawn, and the following opinion is substituted therefor.
The appellant, Jimmy L. Brooks, Jr., was convicted of four counts of capital murder in connection with the, murder of 12-year-old William Brett Bowyer. The murder was made capital (1) because it was committed during the course of a kidnapping in the first degree, see § 13A-5-40(a)(1), Ala.Code 1975; (2) because it was committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975; (3) because it was committed during the course of a burglary in the first degree, see § 13A-5-40 (a)(4), Ala. Code 1975; and (4) because Brett Bowyer was less than 14 years of age at the time of his death, see § 13A-5-40(a)(15), Ala. Code 1975. Brooks was also convicted of attempted murder, a violation of §§ 13A-6-2 and 13A-4-2, Ala.Code 1975, robbery in the first degree, a violation of § 13A-8-41, Ala.Code 1975, and burglary in the first degree, a violation of § 13A-7-5, Ala. Code 1975, with respect to Brett Bowyer's father, Forest F. Bowyer. The jury unanimously recommended that Brooks be sentenced to death for his capital-murder convictions. The trial court accepted the jury's recommendation and sentenced Brooks to death. In addition, the trial court sentenced Brooks to life imprisonment for his convictions of attempted murder, robbery, and burglary.
In its sentencing order, the trial court made the following findings of fact, which are supported by the evidence, regarding the crimes:
"[I]n the evening and early morning hours of February 17 and February 18, 2002, the defendant, Jimmy Lee Brooks, Jr. and another person identified as Michael David Carruth[[1]], entered the home of Forest F. (Butch) Bowyer and his son William Brett Bowyer while the home was occupied by both Forest F. (Butch) Bowyer and his son William Brett Bowyer. William Brett Bowyer was twelve (12) years of age.
"[Brooks] and [Carruth] entered the Bowyer home under the guise of being narcotics officers. The Bowyers were handcuffed and taken to a remote road construction site in rural Russell County, the vicinity of the ultimate murder site, where the elder Bowyer was questioned concerning a safe. The mode of transportation was a white Ford Crown Victoria that had a security shield between the front and back seats.
"The Bowyers were taken back to their home in order for Forest F. (Butch) Bowyer to get money for [Brooks] and [Carruth]. While there, [Carruth] slapped the elder Bowyer. [Brooks] found money and a .38 caliber Smith and Wesson revolver.
"[Brooks] and [Carruth] transported the Bowyers back to the road construction site, this time to the murder site. [Carruth] walked Forest F. (Butch) Bowyer away from the car and cut him on the neck. [Brooks] told Forest F. (Butch) Bowyer that he ([Brooks]) wanted to kill Bowyer whether Bowyer *387 had any money or not. Further, [Brooks] told Bowyer that he was going to enjoy slitting Bowyer's son's throat in front of him. [Carruth] then cut Forest F. (Butch) Bowyer's throat. [Brooks] also cut Bowyer's throat. [Carruth] sat on Forest F. (Butch) Bowyer and told him to `go to sleep.' It was during this period of time that the child, William Brett Bowyer, asked [Brooks] and [Carruth] not to hurt his daddy. The response to the child from [Brooks] was that he needed to be concerned about himself, not his dad.
"[Carruth] told the defendant, Jimmy Lee Brooks, Jr., `I've done one, now you do one.' At this point, the defendant, Jimmy Lee Brooks, Jr., shot the child in the head. When a gurgling sound came from the child, the defendant, Jimmy Lee Brooks, Jr., commented `the little M.F. doesn't want to die' and shot him two (2) more times in the head. The child, William Brett Bowyer, fell into a shallow grave. The father, Forest F. (Butch) Bowyer, was thrown on top of the child. [Brooks] and [Carruth] laughed and joked as they threw dirt on the dead child and his father, covering them in the shallow grave."
(C. 85-87.) After Brooks and Carruth left the scene, Forest Bowyer dug himself out of the grave and flagged down a passing motorist for assistance. He later identified both Brooks and Carruth as the perpetrators of the crimes.
On appeal, Brooks raises eight issues, many of which he did not raise by objection in the trial court. Because Brooks was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
"Plain error" has been defined as error "`so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Ex parte Womack, 435 So.2d 766, 769 (Ala. 1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's `substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). This Court has recognized that "`[t]he plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Crim. App.1993), aff'd, 651 So.2d 659 (Ala.1994), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

I.
Brooks contends that the trial court erred in denying his motion to suppress the statements he made to police after his arrest because, he says, his statements were involuntary. Specifically, he *388 argues that his statements were the result of promises of leniency by law enforcement.
The evidence adduced at the suppression hearing and at trial indicated the following.[2] At approximately 8:30 a.m. the morning after the murder, Harold Smith, a deputy with the Russell County Sheriff's Department, and Susie Burkes, an investigator with the Russell County Sheriff's Department,[3] went to a residence in Lee County, owned by the mother of Brooks's girlfriend, where they believed Brooks was staying. During surveillance of the residence, Deputy Smith saw a man matching Brooks's description standing behind the residence "stirring . . . a fire pit." (R. 271.) A while later, the man and two women left the residence in an automobile, and Deputy Smith and Inv. Burkes executed a traffic stop of the vehicle. The traffic stop occurred at approximately 10:00 a.m. After obtaining the driver's license of the driver of the vehicle and determining that the driver was, in fact, Brooks, Deputy Smith arrested Brooks. Brooks asked Deputy Smith why he was being arrested and Deputy Smith said that it was "in reference to a homicide investigation." (R. 269.) At that point, Brooks told Deputy Smith that he "wanted to take the Fifth." (R. 269.) When Deputy Smith asked Brooks what he meant, Brooks refused to answer. Deputy Smith then advised Brooks of his Miranda[4] rights and Brooks acknowledged that he understood his rights by nodding his head. Deputy Smith placed Brooks in the back of his patrol car and transported him back to the residence.
Because the residence was located in Lee County and the officers were with the Russell County Sheriff's Department, it took several hours to contact Lee County law-enforcement officials and obtain a search warrant for the residence, During that time, Brooks remained handcuffed in the backseat of Deputy Smith's patrol car. Brooks was not questioned during that time, but he was advised of the situation that he would remain at that location until a search warrant could be obtained and the residence searched. Brooks made no requests during that time, but he was offered a sandwich, a drink, and the use of a restroom; he accepted the drink, but declined the other offers. At approximately 4:00 p.m. that afternoon, after the search was complete, Deputy Smith transported Brooks to Brooks's residence in Lee County, where a search was also being conducted. During the transport, Brooks asked Deputy Smith several questions and then confessed. Deputy Smith testified that he did not use any force or coercion or offer any reward or inducement for Brooks to confess. Deputy Smith testified at the suppression hearing regarding his conversation with Brooks as follows:
"[Deputy Smith]: Mr. Brooks asked me, when I got into the patrol vehicle, what was going to happen next. I advised him that we were going to his other residence. Mr. Brooks asked me what we had found at the residence. I advised him that we had found marijuana at both residences. Mr. Brooks asked me what we were going towhat was going to happen, and I advised Mr. *389 Brooks that whoever was in possession of the marijuana would be charged.
"[Prosecutor]: What happened next?
"[Deputy Smith]: Mr. Brooks asked me what he could do to keep his girlfriend and [her mother] out of trouble. I told him that he could start by telling the truth.
"[Prosecutor]: What happened then?
"[Deputy Smith]: Mr. Brooks then asked me what we knew. I advised Mr. Brooks that Mr. Carruth had already given a statement, and we knew about his involvement in the murder of Butch Bowyer and his son.
"[Prosecutor]: What happened next?
"[Deputy Smith]: Mr. Brooks asked me several times, did [Carruth] really give a statement, and I told him, yes.
"[Prosecutor]: What happened then?
"[Deputy Smith]: Brooks askedstated, I'll tell you the truth, will my girlfriend and [her mother]I'll tell you the truth if my girlfriend and [her mother] will not go to jail.
"[Prosecutor]: What did you say?
"[Deputy Smith]: I told him that we would talk to the district attorney and ask them not to charge them for the marijuana.
"[Prosecutor]: What happened then?
"[Deputy Smith]: Brooks asked Brooks stated that [Carruth] and I killed him. Once he said, [Carruth] and I killed him, at that point, I reconfirmed that he understood his Miranda rights.
"[Prosecutor]: So when he told you, we killed him and, [Carruth] and I killed him, you asked him again if he underst[oo]d his Miranda rights. What happened then?
"[Deputy Smith]: He said, yes, I didyes, I do understand my rights."
(R. 278-79.)
When Deputy Smith and Brooks arrived at Brooks's residence, Brooks told Deputy Smith that if he was allowed to use the restroom, he would show Deputy Smith where he had hidden the money he had taken from Forest Bowyer. Deputy Smith and Heath Taylor, a lieutenant with the Russell County Sheriff's Department who was present at the residence, then escorted Brooks into his residence and to the restroom. After using the restroom, Brooks asked Lt. Taylor if he "promised to ask the district attorney in Lee County not to charge his girlfriend and [her mother] for the marijuana" (R. 282), and Lt. Taylor agreed to ask the district attorney in Lee County for help, but he informed Brooks that "it was not up to me as to who got charged and who didn't." (R. 322.) Brooks then indicated that he wanted to talk about the murder. Lt. Taylor advised Brooks of his, Miranda rights; Brooks orally indicated that he understood his rights; and Brooks then again confessed to the murder. Testimony indicated that no one used force or coercion or offered Brooks any reward for making a statement, and specifically that no one told Brooks that he could avoid the death penalty if he confessed.
Following his confession at his residence, Brooks was transported to the Russell County Sheriff's Department, where he was interviewed at approximately 6:40 p.m.; the interview was videotaped.[5] Lt. Taylor testified that he advised *390 Brooks of his Miranda rights; that Brooks indicated that he understood his rights; and that Brooks signed a waiver-of-rights form. Before the recording began, Lt. Taylor said, he told Brooks that he would inform the district attorney and the court that Brooks had been cooperative, and when Brooks asked him "what he was facing," he told Brooks that "in a capital case, he was either facing life without parole or the death penalty." (R. 1005.) Lt. Taylor said that no one coerced or threatened Brooks to make a statement, nor did anyone promise Brooks anything to induce him to make a statement. The videotape begins with Lt. Taylor introducing to Brooks the law-enforcement officers present, from both Russell County and Lee County. The videotape then shows Brooks signing the waiver-of-rights form and asking for help from Lee County. Lt. Taylor told Brooks that both he and Lee County law-enforcement officials would "go to bat" for him with the district attorneys in Lee and Russell Counties, but that as law-enforcement officials they did not have the "final say" regarding what would happen to him; the "final say" rested with the district attorneys. Brooks then again confessed to the murder of Brett Bowyer. At the conclusion of the interview, Brooks indicated that he did not want to be sentenced to death, and Lt. Taylor then informed him that the court system would determine what debt he had to pay for his crimes. Brooks then again asked what he was facing and was informed that the district attorney would be told that he was cooperative and truthful, but that the "ultimate decision" regarding how to proceed against him was up to the district attorney.
"The general rule is that a confession or other inculpatory statement is prima facie involuntary and inadmissible and the burden is on the State to prove by a preponderance of the evidence that such a confession or statement is voluntary and admissible. See, e.g., Ex parte Price, 725 So.2d 1063 (Ala.1998). To prove voluntariness, the State must establish that the defendant `made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him.' Lewis v. State, 535 So.2d 228, 235 (Ala.Crim.App. 1988). If the confession or inculpatory statement is the result of custodial interrogation, the State must also prove that the defendant was properly advised of, and that he voluntarily waived, his Miranda rights. See Ex parte Johnson, 620 So.2d 709 (Ala.1993), and Waldrop v. State, 859 So.2d 1138 (Ala.Crim.App. 2000), aff'd, 859 So.2d 1181 (Ala.2002)."
Eggers v. State, 914 So.2d 883, 898-99 (Ala.Crim.App.2004).
"`It has long, been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe [v. Connecticut], 367 U.S. [568,] 602, 81 S.Ct. [1860,] 1879, 6 L.Ed.2d 1037 [(1961),] the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, "if his will has been overborne" by coercion or inducement, then the confession is involuntary and cannot be admitted into *391 evidence. Id. (emphasis added [in McLeod]).
"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the "totality of the circumstances." Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala. Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App. 1978) (stating that the true test to be employed is "whether the defendant's will was overborne at the time he confessed") (emphasis added [in McLeod]). . . .
"`. . . .
"` . . . Thus, the test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by "apprehension of harm or hope of favor." See [Ex parte] Gaddy, 698 So.2d [1150,] 1154 [(Ala. 1997)] (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala.1988)); Culombe, 367 U.S. at 602, 81 S.Ct. at 1879; Jackson, 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess "the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure"; "[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures." Jackson, 562 So.2d at 1380-81 (citations omitted [in McLeod])'
"McLeod v. State, 718 So.2d 727, 729-30 (Ala.1998) (footnote omitted).
"`Moreover, we note that the mere promise to make cooperation known to law enforcement authorities, as opposed to a direct promise of a reduced sentence, generally is not considered an illegal inducement. In United States v. Nash, 910 F.2d 749, 752-53 (11th Cir.1990), the United States Court of Appeals for the Eleventh Circuit held:
"`"We find that the district court was not clearly erroneous in accepting [the officer's] testimony that he only promised to make [the defendant's] cooperation known to the United States Attorney's office and gave no guarantee of a reduced sentence. Although [the officer] told [the defendant] that cooperating defendants generally `fared better time-wise,' this statement did not amount to an illegal inducement: `telling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to *392 make an informed decision with respect to [his] cooperation with the government.'"
"`(Quoting United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir.1978)). Accord United States v. Levy, 955 F.2d 1098, 1105 (7th Cir.1992) (holding that federal agent's indication to defendant that his cooperation would be reported to the United States Attorney did not make defendant's confession involuntary); United States v. Meirovitz, 918 F.2d 1376, 1380 (8th Cir.1990) (holding that confession was voluntary although agents had promised to inform prosecutor of defendant's cooperation); United States v. Guerrero, 847 F.2d 1363 (9th Cir.1988) (holding that agent's promise to inform prosecutor of defendant's cooperation does not render a subsequent confession involuntary); United States v. Baldacchino, 762 F.2d 170, 179 (1st Cir.1985), (holding that an officer's promise to bring defendant's cooperation to the attention of the prosecutor did not make confession involuntary).'
"718 So.2d at 730-31 n. 4."
Minor v. State, 914 So.2d 372, 392-93 (Ala. Crim.App.2004).
In this case, Brooks was advised of his Miranda rights four timeswhen he was initially arrested, after he initially confessed in Deputy Smith's patrol car, and again before each of his two subsequent confessions. Each time Brooks indicated that he understood his rights, and before his last confession, Brooks signed a waiver-of-rights form. The record reflects that Brooks had completed the ninth grade in school, and had obtained his GED certificate; that he had previously been arrested and was familiar with the criminal justice system; and that he was not under the influence of alcohol or narcotics when he confessed. Although Deputy Smith and Lt. Taylor both told Brooks that they would inform the Russell County district attorney about his cooperation and would speak with the Lee County district attorney regarding the marijuana found in his girlfriend's mother's home, Brooks was repeatedly told that who got charged with what crimes was a decision for the district attorneys, not law-enforcement officers. The evidence indicates that at no time did law-enforcement officers promise Brooks a reduced sentence or promise Brooks that his girlfriend and her mother would not be charged with respect to the marijuana found in their residence. Given the totality of the circumstances, we conclude that no illegal inducements were used to obtain Brooks's confessions and that Brooks's will was not overborne by promises of leniency.
Therefore, we find no error on the part of the trial court in denying Brooks's motion to suppress his statements.

II.
Brooks contends that "[t]he trial court erroneously admitted repetitive and prejudicial autopsy photographs and videos of the victim and gruesome crime scene details that were irrelevant to any issue before the jury." (Brooks's brief at p. 33.) Specifically, Brooks challenges the admission of State's Exhibits 2A, 74, 79, 163, and 188.[6] Brooks's only objection was to the *393 admission of State's Exhibit 163; therefore, we review the admission of State's Exhibits 2A, 74, 79, and 188 under the plain-error rule. See Rule 45A, Ala. R.App.P.
"Generally, photographs are admissible into evidence in a criminal prosecution `if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.'" Bankhead v. State, 585 So.2d 97, 109 (Ala. Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala. Crim.App.1992), rev'd, 625 So.2d 1146 (Ala. 1993), quoting Magwood v. State, 494 So.2d 124, 141 (Ala.Crim.App.1985), aff'd, 494 Sold 154 (Ala.1986). "Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome." Williams v. State, 506 So.2d 368, 371 (Ala.Crim.App. 1986) (citations omitted). In addition, "photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989). "This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim's injuries." Ferguson v. State, 814 So.2d 925, 944 (Ala. Crim.App.2000), aff'd, 814 So.2d 970 (Ala. 2001). `[A]utopsy photographs depicting the character and location of wounds on a victim's body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter.'" Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041, 1108 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), on remand to, 851 So.2d 453 (Ala.2002). "The same rule applies for videotapes as for photographs: `The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury.'" Siebert v. State, 562 So.2d 586, 599 (Ala.Crim.App.1989), aff'd, 562 So.2d 600 (Ala.1990), quoting Walker v. State, 416 So.2d 1083, 1090 (Ala.Crim.App. 1982), See also Ward v. State, 814 So.2d 899 (Ala.Crim.App.2000). Generally, "[a] properly authenticated video tape recording of the scene of the crime constitutes competent evidence" and "is admissible over the defendant's objections that the tape was inflammatory, prejudicial, and cumulative." Kuenzel v. State, 577 So.2d 474, 512-13 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991). "Provided that a proper foundation is laid, the admissibility of videotape evidence in a criminal trial is a matter within the sound discretion of the trial judge." Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Crim.App.1986).
State's Exhibit 2A is a videotape of the crime scene taken from the patrol vehicle of Darrell Powell, a deputy with the Russell County Sheriff's Department, who was the first officer to arrive at the scene. The tape is approximately 14 minutes long and includes both video and audio. The tape begins as the ambulance arrives at the scene to assist Forest Bowyer and shows the massive amount of blood present on Forest Bowyer. The next several minutes of the tape depict Deputy Powell searching the area looking *394 for Brett Bowyer. And the final portion of the video shows Brett Bowyer's body as it was found at the scene. The vast majority of the audio on the tape is radio communications between Deputy Powell and the Russell County Sheriff's Department regarding the situation and his search for Brett Bowyer but also includes, at the beginning, Deputy Powell's questioning of Forest Bowyer regarding the crime and Forest Bowyer's identification of Brooks as one of the perpetrators. State's Exhibits 74 and 79 are photographs of Brett Bowyer's body at the crime scene as he lay partially in and partially out of the grave. Exhibit 74 is a close-up photograph of the body, while exhibit 79 is taken from a distance and shows the location of Brett's body in relation to the roadway. These exhibits were relevant and admissible as depictions of the crime scene. They showed not only the condition of Forest and Brett Bowyer when they were found, but also the remoteness of the crime scene, thus indicating the effort Brooks and Carruth made to cover up their crime.
State's Exhibit 163 is a videotape of Brett Bowyer's body just before the autopsy was performed. The tape is a little over one minute long. It begins with a scan of Brett, fully clothed, from various angles. The tape then scans Brett, unclothed, as he lay on his stomach, showing, in particular, the three gunshot wounds to the back of his head. The tape contains no commentary. This exhibit was clearly relevant and admissible as showing the extent and nature of Brett's wounds.
Finally, State's Exhibit 188 is a videotaped deposition of Dr. Meshati Herawi, the medical examiner who performed the autopsy on Brett Bowyer. Before trial, the State moved, pursuant to § 12-21-264, Ala.Code 1975, and Rule 16.6, Ala.R.Crim.P., to allow Dr. Herawi to be deposed on videotape in lieu of live testimony because Dr. Herawi had moved to Maryland. Brooks agreed to the taking of the deposition and stipulated to the admission of the videotape; therefore, he cannot now complain about its admission. "`A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions.'" Campbell v. State, 570 So.2d 1276, 1282 (Ala.Crim.App.1990), quoting Leverett v. State, 462 So.2d 972, 976-77 (Ala.Crim. App.1984). Moreover, we agree with the State that Brooks's argument that the videotape was gruesome and irrelevant is untenable. The burden was on the State to prove the cause of Brett Bowyer's death, and Dr. Herawi's testimony was necessary to meet this burden of proof. Although Dr. Herawi used various photographs of Brett Bowyer throughout her deposition to illustrate the wounds, those photographs were introduced into evidence at Brooks's trial without objection by Brooks. Indeed, Brooks does not even challenge those particular exhibits on appeal. The videotaped deposition was relevant and admissible. See, e.g., Flowers v. State, 799 So.2d 966 (Ala.Crim.App.1999) (upholding admission of videotaped deposition of medical examiner).
For the reasons stated above, we find no error, much less plain error, in the admission of State's Exhibits 2A, 74, 79, 163, and 188.

III.
Brooks contends that the prosecutor made improper remarks during closing arguments at the guilt phase of the trial. Specifically, Brooks complains about the following passage during the prosecutor's rebuttal closing argument at the guilt phase:

*395 "If it please the Court, [defense counsel] and ladies and gentlemen of the jury, there is a human characteristic that I think most of us share: It is a love for what we like to call justice. Each of us loves fairness and we love justice.
"I would submit to you that if you read the newspaper or you hear about events of the day, you might wonder sometime well, where is it. Where is justice? What's become of it? The rich get richer, the poor get poorer, the powerless become less powerful and the powerful become more powerful. And so there might be some cynicism among our part about justice.
"But I want to submit to you that what we've been doing the last week is testimony to the fact that there can be justice in this country, not complete justice. Complete justice would be to bring that child back to life. Give him three score and ten, give him to his father, erase from his father's memory the horror of that night. You can't do that. You cannot do that, but because we have law in this country, and law, ladies and gentlemen, is not this building, it is not some statute, it is not the judge's robe, it's you.
"It's you looking at the facts in this case and every other case and saying in your heart we love justice and we will do justice.
"In the Jewish faith . . . it says if you love justice, if you would have justice, do justice. And that's all we're, asking in this case. We haven't made up anything against Mr. Brooks. We didn't have to. Believe me, ladies and gentlemen, this was a tale that need[ed] no garnishing. It didn't have to be dressed up to horrify you. These men hatched this plan.
"Michael David Carruth, who is already on death row. Michael David Carruth who did not pull the trigger, the Russell County jurors said you're guilty and justice for you is death. And this man, Jimmy Lee Brooks, Jr., today is his day.
"Every murder case I have ever tried there's a unique unfairness about qt. The unfairness is that, you see we can't call Brett and have him take the stand and tell you what happened. Brett is gone. In most murder cases there is no eyewitness, other than the perpetrator, and the chief eyewitness is gone. He's dead. He's beyond being subpoenaed. He's beyond testifying.
"This case is different. This case is unique in my 26 years of experience, because despite everything that they could do, despite slashing this man's throat three times in front of his 12-year-old child, in spite of throwing him in the cold, damp clay earth of Russell County and covering him up after dousing him with lime, they couldn't kill him. He survived.
"I submit to you that there was some plan, somefor him surviving. And he comes here to tell you what happened, not because it pleases him in any way. He comes here to tell you, not so that he can garnish it or embellish it, because believe me, ladies and gentlemen, if he lives to be a 100 years old, and is very gray and frail, until they put him in his grave, the second grave; because unlike most of us, he's going to the grave twice, he will never be able to wash from his mind, to wash from his every memory, what happened to him and his son the night of the 17th of February and the morning of the 18th of February, 2002.
"God, that he could. God that he could walk outside that house and look out there where his son used to ride that motor bike and there was a dirt track and there would be dirt there, but there *396 isn't. There's grass, because Brett doesn't ride his bike anymore.
"He doesn't ride his bike because that man right there and Michael David Carruth wanted some money. That's it. That's the whole of it. Because they wanted some money.
"It angers me, and I apologize. I'm sorry. Sometimes I talk too loud. I don't hear very well, but sometimes I get angry and I shouldn't get angry. I ought to be more professional than that, but when I hear this man attack a man who went through what he went through, suggest to you that this has got something to do with dope, for what reason, I have no idea, other than to smear this man's reputation with you, it makes me angry. I'm sorry."
(R. 1579-82.) Because Brooks did not object to the prosecutor's argument, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
"This court has stated that `[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.' Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). `In judging a prosecutor's closing argument, the standard is whether the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process."` Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). `A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.' Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 5[2]8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, `statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.' Bankhead, 585 So.2d at 106. `Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.' Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id."
Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). Moreover, "`[t]his court has concluded that the failure to object to improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'" Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985).
Brooks first argues that the prosecutor improperly argued facts not in *397 evidence and improperly injected the issue of sentencing at the guilt phase of the trial when he referred to the fact that Carruth had been sentenced to death for his participation in the murder. Generally, evidence and argument regarding the outcome of a codefendant's case are improper in the trial of a fellow accused. See, e.g., Tomlin v. State, 591 So.2d 550 (Ala.Crim.App. 1991). Moreover, "[p]unishment is `an improper consideration at the guilt phase of [a capital] trial.'" McNair v. State, 653 So.2d 320, 338 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994), quoting Berard v. State, 486 So.2d 476, 479 (Ala.1985). However, a prosecutor may legitimately argue facts in evidence and "[a] prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel." DeBruce v. State, 651 So.2d 599, 609 (Ala.Crim.App.1993), aff'd, 651 So.2d 624 (Ala.1994).
"`"During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference."' Reeves v. State, 807 So.2d 18, 45 (Ala. Crim.App.2000), quoting Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim. App.1987) (citation omitted), rev'd on other grounds, 523 So.2d 1118 (Ala. 1988).
"`"The test of a prosecutor's legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument. Kirkland v. State, 340 So.2d 1139 (Ala.Crim.App.), cert. denied, 340 So.2d 1140 (Ala.1976 [1977]). Statements based on facts admissible in evidence are proper. Henley v. State, 361 So.2d 1148 (Ala.Crim.App.), cert. denied, 361 So.2d 1152 (Ala.1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. Williams v. State, 377 So.2d 634 (Ala.Crim.App.1979); McQueen v. State, 355 So.2d 407 (Ala.Crim.App. 1978)."'
"Ballard v. State, 767 So.2d 1123, 1135 (Ala.Crim.App.1999), writ quashed, 767 So.2d 1142 (Ala.2000), quoting Watson v. State, 398 So.2d 320, 328 (Ala.Crim.App. 1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981)."
Johnson v. State, 823 So.2d 1, 47 (Ala. Crim.App.2001). Moreover, as this Court explained in Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004):
"`"[T]he propriety of argument of counsel to the jury depends upon the particular issues, fact, and atmosphere of each case."` McNair v. State, 653 So.2d 320, 339 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994), quoting Bryson v. State, 264 Ala. 111, 114, 84 So.2d 785, 788 (1955).
"`This court has held on many occasions that in order to determine whether a statement of the prosecutor was improper, "it must be examined in its context and in light of what had transpired, that is, in light of preceding argument of defense counsel, to which the prosecutor's argument was an answer." Washington v. State, 259 Ala. 104, 65 So.2d 704 (1953); Gibson v. State, 347 So.2d 576 (Ala.Crim.App. 1977); Rutledge v. State, [482 So.2d 1250] (Ala.Crim.App.1983). The rule in Alabama is that "remarks or comments of the prosecuting attorney, including those which might otherwise be improper, are not grounds for reversal when they are invited, provoked, or occasioned by accused's counsel and are in reply to or retaliation *398 for his acts and statements." Shewbart v. State, 33 Ala.App. 195, 32 So.2d 241, cert. denied, 249 Ala. 572, 32 So.2d 244 (1947); Camper v. State, 384 So.2d 637 (Ala.Crim.App.1980); Wilder v. State, 401 So.2d 151 (Ala. Crim.App.), cert. denied, 401 So.2d 167 (Ala.1981), cert. denied, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981); Miller v. State, 431 So.2d 586 (Ala.Crim.App.1983); Rutledge, supra.'
"Henderson v. State, 460 So.2d 331, 333 (Ala.Crim.App.1984). "When the door is opened by defense counsel's argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be subject to reply."' Davis v. State, 494 So.2d 851, 855 (Ala. Crim.App.1986), quoting DeFoor, Prosecutorial Misconduct in Closing Argument, 7 Nova L.J. 443, 469 (1982-83)."
914 So.2d at 424-25.
Given the overwhelming evidence of Brooks's guilt, the focus of the defense throughout the trial was to save Brooks's life, either by obtaining a conviction for a lesser-included offense or by avoiding the death penalty if there was a capital conviction. The defense admitted Brooks's participation in the murder, but attempted to place the bulk of the blame for the crime on Michael David Carruth as the person who had planned, and prepared for, the crime. Beginning with opening statements and continuing through closing arguments, the defense repeatedly injected the issue of sentencing into the guilt phase of the trial, including eliciting testimony that Carruth had already received the death penalty. In opening statements, defense counsel informed the jury that "we are here today to fight for [Brooks's] life asking you not, not to sentence [Brooks] to die." (R. 919.) During cross-examination of Tom Franklin, an investigator with the Russell County Sheriff's Department, defense counsel elicited testimony that Carruth had been sentenced to death:
"[Defense counsel]: Out of all this stuff you've got here, all the evidence that you have, all this has been previously introduced at another trial, hasn't it?
"[Inv. Franklin]: I think there's a couple of new exhibits, but most of it, yes, sir.
"[Defense counsel]: And that was the trial of Michael David Carruth?
"[Inv. Franklin]: That's correct.
"[Defense counsel]: And he received the death penalty, didn't he?
"[Inv. Franklin]: That's correct."
(R. 1507.) Defense counsel then began his closing argument with the following statement:
"I told you when we first got started in this that the reason we're trying this case is, trying to save the life of Jimmy Lee Brooks. The facts are the State is here, they want you to sentence him to death. We're asking you to sentence him to life without parole."
(R. 1575.)
Although typically a prosecutor commenting on the outcome of a codefendant's case would be improper, in light of the circumstances of this case, we conclude that the prosecutor's reference to Carruth's death sentence did not so infect the trial with unfairness as to make the resulting convictions a denial of due process. The comment was a legitimate reference to evidence presented by the defense at trial as part of the defense strategy, and was a proper reply-in-kind to defense counsel's repeated arguments throughout the guilt phase asking the jury to sentence Brooks to life imprisonment without the possibility of parole.
*399 Brooks next argues that the prosecutor "inferred in its argument to the jury that the only justice the jury could do in this case was to convict Brooks of the capital and other offenses and sentence him to death." (Brooks's brief at p. 25.) We disagree. When viewed in context, the prosecutor was merely making an appeal for justice. "There is no impropriety in a prosecutor's appeal to the jury for justice and to properly perform its duty." Price v. State, 725 So.2d 1003, 1033 (Ala.Crim. App.1997), aff'd, 725 So.2d 1063 (Ala.1998).
Finally, Brooks argues that the prosecutor improperly expressed his own personal feelings about the case when he referred to how "angry" he was. However, as the State correctly points out, when viewed in context, it is clear that the prosecutor was not expressing his personal feelings about the case, but rather, was expressing his displeasure with defense counsel's attempt to impeach Forest Bowyer. The record reflects that during cross-examination of Bowyer, defense counsel elicited testimony that Bowyer had a previous drug conviction, suggested that Bowyer and his employees had sold drugs from Bowyer's used car business, and attempted to imply that the crime may have involved drugs. It is not improper for a prosecutor to remark on defense tactics. See, e.g., Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004), and the cases cited therein.
For the reasons stated above, we find no error, much less plain error, in the prosecutor's rebuttal closing argument during the guilt phase of the trial.

IV.
Brooks contends that convictions for four counts of capital murder for the murder of a single victim violates doublejeopardy principles. This argument is meritless.
"Each count of capital murder is a separate offense, as shown by the beginning of the statute defining capital offenses, which provides, `The following are capital offenses.' Ala.Code 1975, § 13A-5-40(a). So long as each count of the crime concerns a separate offense, as opposed to a separate method of proving that offense, the double jeopardy provision of the United States Constitution is not implicated."
Ex parte Peraita, 897 So.2d 1227, 1236 (Ala.2004). Brooks was convicted of murder made capital because it was committed during the course of a kidnapping, § 135-40(a)(1); murder made capital because it was committed during the course of a robbery, § 13A-5-40(a)(2); murder made capital because it was committed during the course of a burglary, § 13A-5-40(a)(4); and murder made capital because the victim was a child less than 14 years of age, § 13A-5-40(a)(15). Each of these are separate offenses; thus, convicting Brooks of all four offenses did not violate double-jeopardy principles.
Although Brooks's convictions for four counts of capital murder do not violate the principles of double jeopardy, we are obligated to take notice that his convictions both for murder made capital because it was committed during the course of a burglary and for the underlying burglary do violate double-jeopardy principles. Brooks was charged with capital murder during a burglary as follows:
"The Grand Jury of said county further charge that, before the finding of this indictment, Jimmy L. Brooks, Jr., whose true name is otherwise unknown to the Grand Jury than as stated, did intentionally cause the death of William Brett Bowyer, by shooting the said William Brett Bowyer with a pistol, and Jimmy L. Brooks, Jr., caused said death during the time that Jimmy L. Brooks, *400 Jr., was in the course of knowingly and unlawfully entering or remaining unlawfully in a dwelling with the intent to commit a crime therein[[7]] 171 and in effecting entry or while in the dwelling or in immediate flight therefrom, Jimmy L. Brooks, Jr., or another participant in the crime was armed with a deadly weapon, to-wit: a pistol, in violation of Section 13A-5-40(a)(4) of the Code of Alabama, 1975, as amended, and against the peace and dignity of the State of Alabama."
(C. 364.) Brooks was charged with burglary as follows:
"The Grand Jury of said county charge that, before the finding of this indictment, Jimmy L. Brooks, Jr., whose name is otherwise unknown to the Grand Jury, did knowingly and unlawfully enter or remain unlawfully in a dwelling of Forest F. Bowyer, with intent to commit a crime therein, to-wit: robbery, and while effecting entry or while in the dwelling or in immediate flight therefrom, said defendant did cause physical injury to Forest F. Bowyer, in violation of Section 13A-7-5 of the Code of Alabama, and against the peace and dignity of the State of Alabama."
(C. 1445.)
In reversing the burglary conviction of Brooks's codefendant on this same ground, this Court explained:
"`It is well settled that "[a] defendant cannot be convicted of both a capital offense and a lesser offense that is included in the capital charge." Adams v. State, 955 So.2d 1037, 1098 (Ala.Crim.App.2003). See also Turner v. State, 924 So.2d 737 (Ala.Crim. App.2002). Section 13A-1-8(b), Ala. Code 1975, provides, in pertinent part:
"`"(b) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
"`"(1) One offense is included in the other, as defined in Section 13A-1-9."
"`Such a double jeopardy transgression implicates the jurisdiction of the trial court and must be noticed by this Court regardless of whether it was raised. See, e.g., Straughn v. State, 876 So.2d 492 (Ala.Crim.App.2003) (opinion on return to remand and on application for rehearing); Borden v. State, 711 So.2d 498 (Ala.Crim.App. 1997), aff'd, 711 So.2d 506 (Ala.1998); and Rolling v. State, 673 So.2d 812 (Ala.Crim.App.1995).'
"Buford v. State, 891 So.2d 423, 435-36 (Ala.Crim.App.2004).

*401 "The burglary underlying the indictment for capital murder, during a burglary was the same burglary that formed the basis for the separate burglary indictment. Although the capital indictment charged that Carruth committed the burglary while armed with a deadly weapon, see § 13A-7-5(a)(1), Ala. Code 1975, and the burglary indictment charged that Carruth caused physical injury to Forest Bowyer, see § 13A-7-5(a)(2), Ala.Code 1975, subsections (a)(1) and (a)(2) of § 13A-7-5 are merely alternative means of proving the crime of burglary in the first degree. See, e.g., Perkins v. State, 897 So.2d 457 (Ala. Crim.App.2004), and the cases cited therein."
Carruth v. State, 927 So.2d 866, 880 (Ala. Crim.App.2005).
Similarly, here, the burglary underlying the indictment charging capital, murder during a burglary was the same burglary that formed the basis for the separate indictment charging burglary. Therefore, Brooks's conviction for burglary violates double jeopardy principles and must be vacated.
However, unlike in Carruth, Brooks's conviction for robbery need not be vacated on double-jeopardy grounds because we conclude that Brooks's conviction for capital murder during a robbery must be reversed. Brooks was indicted for murdering Brett Bowyer during the course of robbing Brett's father, Forest Bowyer; the indictment charged:
"The Grand Jury of said, county further charge that, before the finding of this indictment, Jimmy L. Brooks, Jr., whose true name is otherwise unknown to the Grand Jury than as stated, did intentionally cause the death of William Brett Bowyer, by shooting the said William. Brett Bowyer with a pistol, and Jimmy L. Brooks, Jr. caused said death during the time that Jimmy L. Brooks, Jr. was in the course of committing a theft of currency of the United States of America a further and better description being otherwise unknown to the Grand Jury, the property of Forest F. Bowyer, by the use of force against the person of Forest F. Bowyer, with intent to overcome his physical resistance or physical power of resistance, while the said Jimmy L. Brooks, Jr. was armed with a deadly weapon, to-wit: a pistol, in violation of Section 13A-5-40(a)(2) of the Code of Alabama 1975, as amended, and against the peace and dignity of the State of Alabama."
(C. 364; emphasis added.) However, during its jury instructions, the trial court instructed the jury that to find Brooks guilty of capital murder during a robbery, the jury had to find that Brooks murdered Brett Bowyer during the course of robbing Brett, not his father; the trial court instructed:
"Count three. Murder during robbery in the first degree or attempt thereof. [Brooks] is charged with capital murder. The law states that an intentional murder committed during a robbery in the first degree is capital murder.
"A person commits an intentional murder if he causes the death of another person and, in performing the act or acts which cause the death of that person, he intends to kill that person.
"A person commits a robbery in the first degree if, in the course of committing or attempting to commit a theft, he uses forces against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance or threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiesence *402 to the taking of or escaping with the property, and in doing so, he is armed with a deadly weapon.
"To convict, the State must prove beyond a reasonable doubt each of the following elements of an intentional murder during robbery in the first degree: That William Brett Bowyer is dead; that the defendant, Jimmy L. Brooks, Jr., caused the death of William Brett Bowyer by shooting him; that in committing the act which caused the death of William Brett Bowyer, the defendant intended to kill the deceased or another person. A person acts intentionally when it is his purpose to cause the death of another person. The, intent to kill must be real and specific. That the defendant committed or attempted to commit theft of United States currency; that in the course of committing or attempting to commit the theft or immediate flight after the attempt or commission, the defendant either used force or threatened the imminent use of force against a person, William Brett Bowyer, with the intent to overcome his physical resistance or physical power to resist or to compel acquiescence to the taking of the property; that the defendant was armed with a deadly weapon; and that the murder took place during the robbery."
(R. 1596-97; emphasis added.)
In Ash v. State, 843 So.2d 213 (Ala.2002), overruled on other grounds, Ex parte Seymour, 946 So.2d 536 (Ala.2006),[8] the Alabama Supreme Court stated:
"Rule 13.5(a), Ala.R.Crim.P., forbids amending an indictment `to change the offense or to charge a new offense not contemplated by the original indictment.' This rule preserves the implementation of Article I, § 6, Alabama Constitution of 1901, guaranteeing `[t]hat in all criminal prosecutions, the accused has a right . . . to demand the nature and cause of the accusation; and to have a copy thereof . . .' and Article I, § 8, as amended by Amendment 37, Alabama Constitution of 1901, guaranteeing that contested felonies will be charged by grand jury indictment, State ex rel. Baxley v. Strawbridge, 52 Ala.App. 685, 687, 296 So.2d 779, 781 (1974); and Thorn v. State, 39 Ala.App. 227, 227, 98 So.2d 859, 860 (1957); see also Kennedy v. State, 39 Ala.App. 676, 690, 107 So.2d 913, 926 (1958). The fundamental constitutionally guaranteed benefits of an indictment to an accused are "`that he may prepare his defence, and plead the judgment as a bar to any subsequent prosecution for the same offence."' Gayden v. State, 262 Ala. 468, 477, 80 So.2d 501, 504 (1955) (quoting United States v. Simmons, 96 U.S. 360, 3[62] 24 L.Ed. 819 (1877))."
843 So.2d at 216. Here, the trial court's jury instructions clearly amended the capital-murder indictment. The question is whether the amendment charged a new or different offense. We hold that it did.
In McKinney v. State, 511 So.2d 220 (Ala.1987), the Alabama Supreme Court adopted the view of the majority of states that when a single criminal transaction involves multiple victims, multiple convictions are permitted. The Court explained:
"The State has also asked this Court to abandon Alabama's minority position, i.e., that rule that a single criminal act may result in only one conviction. The State contends that our minority rule has evolved from our interpretation of Ala.Code (1975), §§ 13A-1-8(b) and 15-3-8, *403 as amended. Those sections provide:
"`§ 13A-1-8. Procedural matters; civil liabilities not affected by title; prosecution when more than one offense.
"`. . . .
"(b) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
"`(1) One offense is included in the other, as defined in section 13A-1-9; or
"`(2) One offense consists only of a conspiracy or other form of preparation to commit the other; or
"`(3) Inconsistent findings of fact are required to establish the commission of the offenses; or
"(4) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct.'
"`§ 15-3-8. Crimes Punishable under different provisions.
"`Any act or omission declared criminal and punishable in different ways by different provisions of law shall be punished only under one of such provisions, and a conviction or acquittal under any one shall bar a prosecution for the same act or omission under any other provision.'
"A thorough review of Alabama's position on this issue is presented in R. Owens, Alabama's Minority Status: A Single Criminal Act Injuring Multiple Persons Constitutes Only A Single Offense, 16 Cum.L.Rev. 85 (1985-86).
"Alabama is one of only four states that bar multiple convictions which arise from a single criminal act. Thirty-three states have adopted the view that the `degree of culpability, and as a consequence the degree of punishment, must bear some proportion not only to the magnitude of the crime but also to the number of victims involved.' Id., at 90. The author notes that the majority view discounts the importance of a defendant's actual intent as the basis for finding one or more offenses. The Supreme Court of Tennessee said, in reversing that state's previous adherence to the minority view:
"`We are of the opinion that the foregoing analysis [in our prior cases] improperly focuses upon the fictional "intent" of the accused rather than upon the elements of the criminal offense with which he is charged. In [the prior] case, as in this, the offense was homicidethe killing of another person. In our opinion, when more than one person is killed, there is more than one homicideregardless of any fictional "intent" or whether the deaths result from a single "act" or a series of acts. It seems illogical to us, as a general proposition, to hold that when two persons have been killed by the accused, he has committed only one homicide. Prior cases in this state so holding are overruled or modified to the extent that they conflict herewith.'
"State v. Irvin, 603 S.W.2d 121, 123 (Tenn.1980), as cited in 16 Cum.L.Rev., supra, at 91. The majority view permits multiple convictions in cases in which the defendant acted with negligent or reckless intent. Id., at 92.
"In Hurst v. State, 86 Ala. 604, 6 So. 120 (1889), this Court held that the defendant, who had sneaked a file into a jail to help two prisoners escape, and *404 who was subsequently convicted of aiding one of the prisoners, could be convicted of only one offense. Although Justice Stone argued in his dissent that an offender who sought to aid more than one prisoner should be held accountable for every criminal he had helped escape, the majority disagreed. 16 Cum.L.Rev., supra, at 95-96.
"In Hampton [v. State, 455 So.2d 149 (Ala.Crim.App.1984) 1, Free [v. State, 455 So.2d 137 (Ala.Crim.App.1984)], Scott [v. State, 473 So.2d 1167 (Ala.Crim. App.1985)], and O'Neal [v. State, 461 So.2d 54 (Ala.Crim.App.1984) ], Alabama has held to the minority view that only one conviction could result from a single criminal act. In Hampton, the Court of Criminal Appeals said that a single shotgun blast that wounded three people was, under Alabama law, only one criminal act. Judge Bowen said, however:
"`We are thoroughly convinced that the view that each injury is to be regarded as constituting a separate or distinct offense is sustained by the weight of authority and by the better reason. Berry v. State, 195 Miss. 899, 16 So.2d 629 (1944). However, it is not the law in this state. We respectfully urge our Supreme Court to adopt this view.'
"Hampton v. State, supra, at 152.
"Neither the federal nor the state constitution poses an obstacle to permitting multiple prosecutions when there has been more than one offense found. In Gordon v. State, 71 Ala. 315 (1882), this Court held that the constitutional guaranty against double jeopardy does `not extend to several prosecutions for several offenses, but to repeated prosecutions for the same offense.' Id., at 317, as cited in 16 Cum.L.Rev., supra, at 101. The minority views a single blast that injures two people as the `same offense' or one criminal act. By contrast, the majority regards such an act as two offenses. As the author of the law review article has pointed out, the determination of what is the same offense is a question for the courts to decide. 16 Cum.L.Rev., supra, at 101. He concludes that §§ 15-3-8 and 13A-1-8 do not bar multiple convictions as the result of a single act when multiple victims are involved. Referring to § 15-3-8, he says:
"`This statute has been routinely interpreted to apply the test used by the United States Supreme Court decision in Blockburger v. United States [284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)]: "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or one, is whether each provision requires proof of a fact which the other does not." [Id., at 304, 52 S.Ct. at 182]. In Sears v. State, [479 So.2d 1308 (Ala.Crim.App.1985) the Alabama Court of Criminal Appeals stated that the Alabama appellate courts rely on the Blockburger test in situations where a single act has resulted in multiple victims. The Sears court further noted this interpretation equates the statutory term "act or omission" with the double jeopardy term "same offense" thus resulting in the statute's protection being confined to the constitutional guaranty against double jeopardy. [Id., at 1312].
"`Additionally, in Ian[n]elli v. United States, [420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975)], the United States Supreme Court declared. "the Court's application of the test focuses on the statutory elements of the offense. If each requires proof of a fact that the *405 other does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." [Id., at 785 n. 17, 95 S.Ct. at 1293 n. 17.] If the Alabama courts continue to interpret the statute as a codification of Blockburger, . . . multiple convictions may be allowed.'
"16 Cum.L.Rev., supra, at 102-03.
"Section 13A-1-8(b) does not bar multiple convictions when a single act results in multiple offenses, except, for example, in the case of lesser included offenses.
"`The interpretation of section 15-3-8 using the Blockburger test, combined with section 13A-[1]-8's specific approval of multiple convictions when a defendant's conduct constitutes multiple offenses, indicates there is no statutory prohibition against multiple convictions for multiple victims resulting from a single act.'
"16 Cum.L.Rev., supra, at 103-04.
"Finally, as Owens points out, legislative intent to allow multiple prosecutions for a single act that injures more than one person is determined by the `description of the unit of prosecution within the substantive criminal law statutes.' 16 Cum.L.Rev., supra, at 104.
"Avoidance of ambiguity is essential. Owens asks:
"`How, then, should the unit of prosecution be described so that an intent to allow multiple convictions is clear and unequivocal? Instead of using the word "any" to describe the unit of prosecution, the singular words "a" or "another" should be used. An examination, then, should be made of the Alabama Criminal Code to see how the unit of prosecution is described. This examination will disclose whether the code allows multiple convictions.
"`A review of the criminal code discloses that there are basically four categories into which the statutes can be divided. The first category includes those statutes that prohibit conduct that cannot affect multiple persons or property with a single act. These statutes prohibit such crimes as sex offenses, criminal trespass, burglary, forgery, and escape. The second category contains statutes in which the unit of prosecution is described with the word "any"; based on the above mode of statutory construction, only one conviction should be allowed. This category consists of the following statutes: interference with custody, indecent exposure, enticement of a child to enter a vehicle or house for immoral purposes, possession of burglary tools, criminal possession of explosives, and transportation of stolen property, or property obtained by false pretense into the state.
"`Under the majority view, the remaining two categories would allow multiple convictions. The third category uses the indefinite article "a" to describe the unit of prosecution, and includes such offenses as arson, offering a false instrument for recording, illegally possessing or fraudulently using a credit or debit card, permitting or facilitating an escape, bribing or intimidating a witness or a juror, promoting prostitution, abandoning a child, and endangering the welfare of a child. The last category uses the descriptive term "another," and incorporates, in addition to the above offenses, all forms of homicide, assault, kidnapping and unlawful imprisonment, theft of property, robbery, and the hindering of the prosecution or the apprehension of an escapee.

*406 "`By employing the method of statutory construction used by the United States Supreme Court to determine whether the legislative drafters intended to allow multiple convictions, it becomes clear that the Alabama Legislature formulated the criminal code using descriptive words that allow multiple convictions. To truly adopt the majority view, however, multiple convictions should be allowed only for crimes against persons. If Alabama accepts the majority rule allowing multiple convictions, future incidents in which more than one person is injured or killed by the same act will subject the defendant to as many convictions as there are injuries or deaths.'
"16 Cum.L.Rev., supra, at 105-07.
"Owens has articulately stated the case for joining the majority of states that allow for multiple convictions when more than one person is injured as the result of a single act. Adoption of the majority view would place Alabama among those states that have recognized that punishment for a criminal act should be commensurate with the act itself and the injury caused by that criminal act. Absent statutory or constitutional obstacles to the adoption of the majority view, logic and reason persuade us to henceforth apply the principle that a single criminal act that causes injury to more than one person may constitute more than one offense and may support more than one prosecution and conviction.
"The Court of Criminal Appeals was, correct in reversing McKinney's convictions and in ordering a new trial. As stated herein, however, we also hold that henceforth §§ 13A-1-8(b) and 15-3-8 will allow more than one prosecution and conviction when more than one person is injured as a result of a single criminal act."
511 So.2d at 222-25. In Sims v. State, 663 So.2d 975 (Ala.Crim.App.1994), this Court applied the McKinney rule to the offense of robbery, holding that the appellant's convictions for two counts of robbery arising out of a single act did not violate double-jeopardy principles because two victims were involved.
A person commits the crime of robbery in the first degree if, in the course of committing a theft, he or she uses force against the owner of the property or any person present with intent to overcome his physical resistance or physical power of resistance, or threatens the imminent use of force against the owner of the property or any person present with intent to compel acquiescence to the taking of or escaping with the property, and he or she is armed with a deadly weapon or dangerous instrument or causes serious physical injury to another. §§ 13A-8-41 and 13A-8-43, Ala.Code 1975. A person commits the crime of murder if, with intent to cause the death of another person, he or she causes the death of that person or of another person. Both robbery and murder are crimes against the person, and they both fall into the final two categories of statutes referred to in McKinney and R. Owens, Alabama's Minority Status: A Single Criminal Act Injuring Multiple Persons Constitutes Only a Single Offense, 16 Cum.L.Rev. 85 (1985-86), that allow multiple convictions when multiple victims are involved. Likewise, capital murder during a robbery also falls into the category of statutes allowing multiple convictions when multiple victims are involved. Section 13A-5-40(a)(2) defines capital murder during a robbery as "[m]urder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant." (Emphasis added.) The use of the indefinite article "a" in describing the *407 unit of prosecution allows for multiple convictions when a murder is committed during the course of multiple robberies of multiple victims. In other words, the capital offense of murder during a robbery contemplates that the murder was committed during the course of a single robbery, If the murder is committed during more than one robbery against more than one person, then more than one conviction for capital murder during a robbery is permitted, just as more than one conviction for robbery would be permitted, even when only one of the victims is murdered.
This differs, of course, from the situation where the murder is committed during the course of a single robbery and alternative theories of proving that robbery are used to obtain multiple convictions. For example, in Wynn v. State, 804 So.2d 1122 (Ala.Crim.App.2000), this Court held that the appellant's convictions for two counts of capital murder during a robbery and two counts of capital murder during a burglary violated double jeopardy principles because each of the two counts charged alternative methods of proving the single crimes of robbery and burglary, respectively; we explained:
"First, we conclude that the appellant's convictions for two counts of robbery-murder and two counts of burglary-murder violate double-jeopardy principles. The appellant was charged, in a four-count indictment, with two counts of robbery-murder and two counts of burglary-murder in connection with the murder of Denise Bliss. Count I alleged that the appellant committed the robbery-murder `while [he] was armed with a deadly weapon or a dangerous instrument.' (C.R. 19.) Count II alleged that, in the course of the robbery-murder, the appellant `caused serious physical injury to the said Denise Bliss.' (C.R. 19.)
"`. . . . '
". . . Clearly, Counts I and II were simply alternative methods of proving the single offense of robbery-murder. Similarly, Count III alleged that, while committing the burglary-murder, the appellant `did use or threaten the immediate use of a dangerous instrument,' and Count IV alleged that; while committing the burglary-murder, the appellant `did cause physical injury to Denise Bliss.' (C.R. 20.)
"`. . . . '
". . . Again, Counts III and IV were simply alternative methods of proving the single offense of burglary-murder. We addressed a similar situation in Stewart v. State, 601 So.2d 491, 494-95 (Ala.Crim.App.1992), aff'd in part, rev'd in part on other grounds, 659 So.2d 122 (Ala.1993), aff'd, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999), and held:
"The six indictments show that the appellant was charged with four counts of intentional murder during the course of a burglary and with two counts of murder during the course of a kidnapping, In fact, the prosecutor alluded to the fact that the indictments were alternative ways of charging the appellant after the court's dialogue above. The four indictments charging murder during the course of a burglary merely detailed alternative ways of proving the elements of burglary. The two indictments charging murder during the course of a kidnapping alleged alternative methods of establishing the crime of kidnapping. We realize that "the purpose of the [alternative] counts was not to charge two or more separate offenses, but to vary the description of one and the same offense based upon one and the same transaction." Floyd v. State, *408 486 So.2d 1309, 1313 (Ala.Cr.App. 1984), aff'd, 486 So.2d 1321 (Ala.1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1328, 94 L.Ed.2d 179 (1987). However, we do not have here a case like Floyd. In Floyd, the appellant was not convicted of all eight counts of capital murder but was convicted of only one count of capital murder. In the present case, the appellant was convicted on all six counts of capital murder. We do agree with the court in Floyd that the state would not have been required to elect which alternative counts under § 13A-5-40(a)(1) and § 13A-5-40(a)(4) would be presented to the jury. Alternative methods of proving the same crime "[do] not constitute separate offenses." Ex parte State [Sisson v. State], 528 So.2d 1159, 1162 (Ala.1988). However, the appellant's conviction on all six alternative counts cannot stand. Thus, according to Sisson, the convictions on three counts of murder during the course of a burglary and on one count of murder during the course of kidnapping must be vacated. A person cannot be convicted for the same crime twice because to do so would violate the principles of double jeopardy. Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990); Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). (For an in depth discussion applying the principles of Sisson and Blockburger to facts similar to those in this case, see Judge Bowen's special concurrence opinion in King v. State, 574 So.2d 921 (Ala.Cr.App. 1990).)'
"For the reasons set forth in Stewart, the appellant's convictions on two alternative counts of robbery-murder and two alternative counts of burglary-murder cannot stand. However, one conviction for robbery-murder and one conviction for burglary-murder have been proven and may stand. Accordingly, we remand this case to the trial court with instructions that it vacate one of the appellant's convictions for robbery-murder and one of the appellant's convictions for burglary-murder."
804 So.2d at 1148-50.
The evidence here, unlike the evidence in Wynn, undisputedly showed two separate and distinct robberies against two different victimsone against Forest Bowyer and one against Brett Bowyer. Because two victims were involved, Brooks could have been charged and convicted separately for two counts of capital murder during a robberymurder during the course of robbing Forest Bowyer and murder during the course of robbing Brett Bowyer. Because Brooks could have been charged and convicted separately for two counts of capital murder during a robbery based on the two separate robberies, we must conclude that the trial court's jury instructions constituted an amendment to the capital-murder-during-a-robbery indictment, which changed the robbery from the robbery of Forest Bowyer to the robbery of Brett Bowyer and, thus, charged a new or different offense not contemplated by the original indictment, running afoul of Rule 13.5, Ala.R.Crim.P.
In its brief on application for rehearing, the State argues that the trial court read the indictment to the jury during its preliminary instructions and that the presentation of the evidence at trial was premised solely on the fact that Forest Bowyer was the victim of the robbery. Thus, the State concludes, the trial court's inadvertent "slip of the tongue" did not serve to amend the indictment and, at most, was harmless error. (State's brief on rehearing, p. 4.) We acknowledge that the trial court read the indictment to the jury; however, it did *409 so before voir dire examination, on February 2, 2004, seven days before the trial court's final guilt-phase instructions were given on February 9, 2004. We also agree that the evidence in this case undoubtedly established that Forest Bowyer was robbed; however, as noted, the evidence also established that Brett Bowyer was robbed. In addition, at no time during opening or closing statements did the prosecutor specifically focus on Forest Bowyer as the victim of the robbery underlying the capital-murder charge; rather, the prosecutor referred to "them," meaning both Forest Bowyer and Brett Bowyer, as victims of the robbery. (R. 1552; 1556; 1570.)[9] Moreover, Brooks was indicted for the robbery of Forest Bowyer independent of the capital-murder charge. Therefore, we cannot agree that the State's presentation of its case was premised solely on the fact that Forest Bowyer was the victim of the robbery underlying the capital-murder charge.
We also cannot assume that the jurors remembered, seven days later, the specific wording of the indictment charging capital murder during a robbery as it was read to them before voir dire examination, at the same time that the other six charges were also read to them, and that they understood, based on those seven-day-old instructions and in light of the ambiguity in the State's presentation of its case, that Brooks was charged with capital murder during the robbery of Forest Bowyer, as opposed to capital murder during the robbery of Brett Bowyer as the trial court instructed them just before deliberations. To do so would not only strain credulity, but would require us to presume that the jurors disregarded the trial court's final guilt-phase instructions. It is well settled that jurors are presumed to follow, not disregard, the trial court's instructions. See, e.g., Stephens v. State, [Ms. CR-02-0154, August 12, 2005] ___ So.2d ___, ___ (Ala.Crim.App.2005) ("Jurors are presumed to follow the judge's instructions."); Minor v. State, 914 So.2d 372, 418 (Ala. Crim.App.2004) ("Jurors are presumed to follow their instructions."); Peraita v. State, 897 So.2d 1161, 1204 (Ala.Crim.App. 2003) ("`Jurors are presumed to follow the trial court's instructions.'"), aff'd, 897 So.2d 1227 (Ala.2004), quoting Bryant v. State, 727 So.2d 870, 874-75 (Ala.Crim. App.1998); Centobie v. State, 861 Sold 1111, 1135 (Ala.Crim.App.2001) ("`Jurors are presumed to follow the instructions of the trial court.'"), quoting Griffin v. State, 790 So.2d 267, 334 (Ala.Crim.App.1999), rev'd on other grounds, 790 So.2d 351 (Ala. 2000); and Burgess v. State, 827 So.2d 134, 162 (Ala.Crim.App.1998) ("Jurors are presumed to follow the court's instructions."), aff'd, 827 So.2d 193 (Ala.2000). Under the circumstances in this case, we must presume that the jurors followed the trial court's instructions regarding the charge of murder made capital because it was committed during a robbery and found, as instructed by the court, that Brooks murdered Brett Bowyer during the course of robbing Brett, not during the course of robbing Forest Bowyer as charged in the indictment.
The State's reliance on United States v. Andrews, 850 F.2d 1557 (11th Cir.1988), is misplaced. In Andrews, Sylvester Andrews was charged with conspiring with *410 his codefendant Robert Ford to distribute cocaine. In its instructions to the jury, the trial court gave a standard instruction on conspiracy law, including the following statements:
"`In order to establish a conspiracy offense, it is not necessary for the government to prove that all of the people named in the indictment were members of the scheme or that those who were members had entered into any formal type of agreement.
"` . . . What the evidence in the case must show beyond a reasonable doubt is, first, that two or more persons in some way or manner came to a mutual understanding to try to accomplish a common and unlawful plan as charged in the indictment;. . . .
"`. . . .
"`Now, a government agent, such as a confidential source or a police officer, cannot be a co-conspirator inasmuch as he is working for the government. Accordingly, in order to find one or both of the defendants guilty of the crime of conspiracy, you must find that each of them conspired with someone other than a government agent.'"
850 F.2d at 1559. In holding that these isolated comments did not amend the indictment, the United States Court of Appeals for the Eleventh Circuit noted that, during its instructions, the trial court had "read the indictment [to the jury] and repeatedly linked the instructions to the indictment"; had "described the crime of conspiracy in terms of the `defendants' namely, Ford and Andrewsand not just `persons'"; and had "instructed [the jury] that it `must follow all of [the court's] instructions as a whole. You may not single out or disregard any of the Court's instructions on the law.'" 850 F.2d at 1559 (footnotes omitted). The Court also noted that the only evidence presented at trial was that Andrews and Ford had conspired together and that the government had not shown nor argued that any other persons were involved. In this case, however, unlike in Andrews, the trial court did not read the indictment to the jury during its final guilt-phase instructions, but did so seven days earlier before voir dire examination, nor did the court at any time link its instructions to the indictment. In addition, as noted above, there was evidence presented of a robbery of Brett Bowyer in addition to evidence of a robbery of Forest Bowyer and at no time did the prosecutor specifically argue that Forest Bowyer was the victim of the robbery underlying the capital-murder charge.
Williams v. State, 701 So.2d 832 (Ala. Crim.App.1997), is more akin to this case than is Andrews. Williams was indicted for robbing Christopher Rashon Love and Eric Alexander; however, in its jury instructions, the trial court instructed the jury that it could find Williams guilty if it found that Williams had robbed Christopher Rashon Love or Eric Alexander. In reversing Williams's conviction, this Court stated:
"The trial court has a mandatory duty of instructing the jury orally as to the different and distinguishing elements of the offense charged.' Davidson v. State, 360 So.2d 728, 730 (Ala.Cr. App.), cert. denied, 360 So.2d 731 (Ala. 1978). It is clear that in order for the jury to convict Williams of the offense charged in the indictment, the jury would have to have found him guilty of robbing both alleged victims. See Dobyne v. State, 672 So.2d 1319, 1341 (Ala. Cr.App.1994), on return to remand, 672 So.2d 1353 (Ala.Cr.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571 (1996); Styles v. State, 474 So.2d 185, 188 (Ala.Cr.App. *411 1985). It is equally clear that if the jury followed the trial court's instruction, it could have found Williams guilty based on the robbery of either of the alleged victims. In Styles v. State, supra, the trial court explained to the jury that an indictment conjunctively alleging, crimes against two victims should have alleged the crimes disjunctively in the alternative. The court's instruction effectively amended the indictment, so that instead of alleging crimes against A and B, the indictment alleged crimes against A and/or B. We noted in Styles that actual prejudice was shown when the trial court's polling of the jury indicated that the conviction was actually based on a crime against just one of the victims; we believe that sufficient prejudice has also been demonstrated in the instant case. The record reveals that only one of the alleged victims in the instant case, Eric Alexander, actually testified at trial. The trial court's instruction that Williams could be found guilty on proof of fewer facts than alleged in the indictment was improper and unduly prejudiced Williams's substantial rights.

"In the instant case, the State could properly have chosen to seek indictments on two separate counts of robbery in the first degree. By charging conjunctively the robbery of both victims, the indictment required proof of both robberies in order for the jury to reach a guilty verdict. The trial court's instruction that only proof of the robbery of either of the alleged victims was necessary to sustain a guilty verdict was reversible error."
701 So.2d at 833-34 (some emphasis added).
The circumstances in this case are even more compelling than those in Williams. The indictment against Williams put him on notice that he was expected to defend against the robbery of both victims, but the jury-instruction amendment reduced the charge to just one victim. Here, however, the jury-instruction amendment did not merely narrow the allegations in the indictment, but actually changed the offense for which Brooks was indictedcapital murder during the robbery of Forest Bowyerto an offense for which Brooks had never been indicted and had never received notice that he was expected to defend againstcapital murder during the robbery of Brett Bowyer. In other words, Brooks was convicted of `an offense for which he had not been properly charged. "Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." Stirone v. United States, 361 U.S. 212, 217, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). Thus, we conclude that the jury-instruction amendment in this case constitutes plain error.
Accordingly, Brooks's conviction for capital murder during a robbery must be reversed.

V.
Brooks contends that the trial court erred in instructing the jury that any aggravating circumstance included in the verdicts convicting him at the guilt phase of the trial should be considered as proven beyond a reasonable doubt for purposes of sentencing. Specifically, he argues that because double jeopardy prohibited his convictions for multiple counts of capital murder for the murder of a single victim, the aggravating circumstances of kidnapping, robbery, and burglary had not all been proven beyond a reasonable doubt at the guilt phase and, thus, the court's instruction was erroneous.[10] Brooks did not *412 raise this issue in the trial court; therefore, we review it under the plain-error rule. See Rule 45A, Ala.R.App.P.
We have already determined that Brooks's convictions for multiple counts of capital murder for the murder of a single victim do not violate double-jeopardy principles. Therefore, Brooks's specific claimthat double jeopardy prohibited the trial court from instructing the jury that any aggravating circumstance that had been found during the guilt phase of the trial should be considered as proven beyond a reasonable doubt for purposes of sentencingis clearly meritless. See § 13A-5-45(e), Ala.Code 1975 ("any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing"). See also Stewart v. State, 730 So.2d 1203, 1215 (Ala.Crim.App.1996) (because the appellant's conviction for capital murder during a burglary was valid, "[i]t follows then that the trial court during the sentencing phase did not err in instructing the jury that the State had proved the burglary-murder aggravating circumstance as a matter of law during the guilt phase"), aff'd, 730 So.2d 1246 (Ala.1999).
However, because Brooks's conviction for capital murder during a robbery was invalid for the reasons stated in Part IV of this opinion, it was error for the trial court to include in its instruction the aggravating circumstance that the murder was committed during the course of a robbery. As noted, the trial court's guilt-phase instructions on the charge of capital murder during a robbery improperly amended the indictment to charge a new or different offense. Thus, Brooks's conviction for the capital murder of Brett Bowyer during the robbery of Brett was invalid, and the trial court should not have instructed the jury that that conviction established beyond a reasonable doubt the aggravating circumstance that the murder occurred during the course of a robbery. Although the jury found Brooks guilty of the murder of Brett Bowyer and found Brooks guilty of the robbery of Forest Bowyer in separate counts, those verdicts did not require a finding by the jury that the murder occurred during the course of the robbery, as required for the aggravating circumstance in § 13A-5-49(4), Ala. Code 1975 ("The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping."). See § 13A-5-39(2), Ala.Code 1975 (defining "during" for purposes of the capital-murder statute as "in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or attempt thereof').
However, we find the error to be harmless. In Lawhom v. State, 581 So.2d 1159 (Ala.Crim.App.1990), aff'd, 581 So.2d 1179 (Ala.1991), this Court faced a similar situation involving an erroneous jury instruction on an aggravating circumstance:
"The prosecution argued, to the jury, that it had presented sufficient evidence to establish the aggravating circumstance that Wile capital offense was especially heinous, atrocious or cruel compared to other capital offenses,' § 135-49(8), and the trial court charged the jury that it could consider this circumstance. Appellant contends that the charge was error because the circumstance *413 did not apply since the evidence did not support it.
"Appellant's narrow issuethat the court's charge on this aggravating circumstance was error because it was not supported by the evidenceis clearly without merit. The unconflicting evidence established that appellant, Mac Lawhorn, and Walker ran Berry down and shot him like an animal. Berry, completely defenseless in an isolated area and in fear for his life, futilely ran from his girlfriend, only to be passed by her truck and to be confronted with the barrel of a shotgun in his face. After being knocked down by the first blast, he managed to get to his feet, only to be shot again. He fell again, and a third shot was fired, hitting the ground in front of where he lay, entangled in vines and underbrush. As he was lying there, trapped and making gurgling noises, appellant walked over to him and shot him three times, two directed at the head area and one directed at the chest area. This evidence clearly warranted the jury's considering the `especially heinous' aggravating circumstance. When a defendant deliberately shoots a victim in the head in a calculated fashion, after the victim has already been rendered helpless by gunshots to the chest, such `extremely wicked or shockingly evil' action may be characterized as especially heinous, atrocious, or cruel. Bush v. State, 431 So.2d 555, 560-61 (Ala.Cr. App.1982), aff'd, 431 So.2d 563 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983) (citing Hargrave v. State, 366 So.2d 1, 5 (Fla.1978), cert. denied, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979)). See also Hallford v. State, 548 So.2d 526, 542-43 (Ala.Cr. App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, [493] U.S. [945], 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).
"While we find that the trial court's charge was not erroneous on the ground asserted by appellant, we do find that it was erroneous, for it did not contain a limiting definition of the `especially heinous' aggravating circumstance. . . .
". . . .
"Although we consider the jury's finding of the aggravating circumstance to be invalid because it was not guided by sufficient instruction, we find no imperative to reverse and remand this cause for resentencing. . . .
". . . .
". . . [W]e find no impediment to prevent us from reviewing the insufficient instruction for harmless error. The Clemons [v. Mississippi, 494 U.S. 738 (1990) ] Court, in discussing this alternative stated the following:
"`Even if under Mississippi law, the weighing of aggravating and mitigating circumstances were not an appellate, but a jury function, it was open to the Mississippi Supreme Court to find that the error which occurred during the sentencing proceeding was harmless. See, e.g. Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792 [100 L.Ed.2d 284] . . . (1988). As the plurality in Barclay v. Florida, [463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983)], opined, the Florida Supreme Court could apply harmless error analysis when reviewing a death sentence imposed by a trial judge who relied on an aggravating circumstance not available for his consideration under Florida law:
"`"Cases such as [those cited by the petitioner] indicate that the Florida Supreme Court does not apply its harmless-error analysis in an automatic or mechanical fashion, but rather upholds death sentences on the basis of this analysis only *414 when it actually finds that the error is harmless. There is no reason why the Florida Supreme Court cannot examine the balance struck by the trial judge and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance. . . . What is important . . . is an individualized determination on the basis of the character of the individual and the circumstances of the crime.' Zant [v. Stephens, 462 U.S. 862,] 879[, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983)] (emphasis in original). Id., [463 U.S.] at 958, 103 S.Ct., at 3429."'
"[494] U.S. at [752-53], 110 S.Ct. at 1450.
"In Alabama, `the harmless error rule does apply in capital cases at the sentence hearing.' Ex parte Whisenhant, 482 So.2d 1241, 1244 (Ala.1983). However, it `is to be applied with extreme caution in capital cases,' and this caution must be observed when reviewing error in the penalty phase, for `[a]fter all, it is the penalty which distinguishes these cases from all other cases.' Ex parte Whisenhant, 482 So.2d 1247, 1249 (Ala. 1984).
"To determine whether the trial court's failure to instruct properly was harmless error, the Clemons Court suggests one of two inquiries: (1) whether beyond reasonable doubt the sentence would have been the same had the `especially heinous' circumstance not been considered by the jury at all, or (2) whether beyond reasonable doubt the result would have been the same had the circumstance been properly defined in the jury instructions. See also Henry v. Wainwright, 721 F.2d 990, 995 (5th Cir. 1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984) (wherein the court, in holding harmless the trial court's failure to instruct that aggravating circumstances must be found beyond a reasonable doubt, stated that `[f]or the failure to give the instruction to be harmless, the evidence must be so overwhelming that the omission beyond a reasonable doubt did not contribute to the verdict').
"For purposes of our review of this case, we employ the second Clemons inquiry. There is no question, at all, that, had the jury been properly instructed, it would still have returned a recommendation of death because the facts presented to the jury established, beyond any doubt, that this crime was especially heinous, atrocious, or cruel when compared to other capital offenses. The evidence of this circumstance is overwhelming; the facts so conclusively establish it, that no rational jury, properly instructed, could have found otherwise. The evidence is unconflicting that appellant directly participated in a conscienceless, pitiless, and torturous murder. Berry's last minutes were obviously filled with terror, fear, and knowledge that his death was imminent, and he experienced a high degree of prolonged pain before his death. All of this was accomplished by appellant with complete indifferencecomplete indifference to Berry's pain and terror and complete indifference to the value of human life, which he found to be worth $50. Clearly, this evidence sets this crime apart, for the degree of heinousness, atrociousness, and cruelty of this offense exceeds that which would be common to all capital offenses. By any standard acceptable to civilized society, this crime was outrageously wicked and shockingly evil. In fact, appellant admitted, during the sentencing phase, that as the victim lay entangled in the underbrush and unable to talk, but gurgling, he repeatedly shot *415 the victim and, at the time, did not care whether the victim died or not.
"We note that this situation does not involve the jury's consideration of misleading, inaccurate, or illegal information or evidence. Rather, it is a case where the aggravating circumstance, overwhelmingly supported by admissible evidence, was rendered invalid because it was unconstitutionally presented to the jury. We find that the jury's improper consideration of this aggravating circumstance and possibly improper consideration by the trial`court did not render appellant's sentencing fundamentally unfair. It is unnecessary to vacate appellant's`sentence because we are convinced beyond a reasonable doubt that, had the circumstances been properly narrowed, the jury would have recommended the same sentence and the trial court would have imposed the same sentence. We hold this, even in the face of our recognition of the utmost importance of insuring that a death sentence not be based on arbitrary and capricious action. While we, in theory, would be very hesitant to find harmless error in the submission to the jury of an unconstitutionally defined aggravating circumstance, we find that the facts of this case support such an application beyond a reasonable doubt."
581 So.2d at 1174-77 (footnote omitted).
In this case, we find the error in the trial court's jury instructions to be harmless beyond a reasonable doubt under the second inquiry set forth in Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). The evidence in this case clearly warranted an instruction on the aggravating circumstance that the murder occurred during the course of a robbery. There is no doubt, based on our review of the record, that if the trial court. had properly instructed the jury on the aggravating circumstance that the murder occurred during the course of a robbery as opposed to instructing the jury that that aggravating circumstance had already been proven beyond a reasonable doubt by virtue of its guilt-phase verdictthe jury would have found the circumstance to exist. The jury, during the guilt phase, found that Brooks murdered Brett Bowyer and found that Brooks robbed Forest Bowyer, and under the facts in this case, no reasonable juror could have possibly found that the murder did not occur during the course of the robbery. We are convinced beyond a reasonable doubt that, had the trial court properly instructed the jury on the robbery aggravating circumstance, the jury would have found the circumstance to exist and would have recommended the same sentence and the trial court would have imposed the same sentence.

VI.
Brooks contends that the trial court erred in treating kidnapping, robbery, and burglary both as elements of the capital offenses and as aggravating circumstances.[11] Because Brooks did not raise this issue in the trial court, we review it under the plain-error rule. See Rule 45A, Ala.R.App.P. Both this Court and the Alabama Supreme Court have repeatedly upheld the practice of "double counting" or "overlapping." See Clark v. State, 896 So.2d 584, 644-45 (Ala.Crim.App.2000), and the cases cited therein. See also *416 § 13A-5-50, Ala.Code 1975 ("The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."), and § 13A-5-45(e), Ala.Code 1975 ("[A]ny. aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."). Therefore, we find no error, much less plain error, in the trial court's treating kidnapping, robbery, and burglary as both elements of the capital offenses and as aggravating circumstances.

VII.
Brooks contends that the trial court erred in instructing the jury on, and in finding the existence of, the aggravating circumstance that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses. Specifically, he argues that the evidence was insufficient to support the application of the especially heinous, atrocious, or cruel aggravating circumstance, and that the trial court erroneously relied on "acts committed against the victim's father," instead of acts committed against Brett Bowyer, to support instructing the jury on, and finding the existence of, this aggravating circumstance. (Brooks's brief at p. 32.) Brooks objected to the trial court's instructing the jury on the especially heinous, atrocious, or cruel aggravating circumstance, but he did not object to the trial court's finding in this regard; therefore, we review the trial court's finding under the plain-error rule. See Rule 45A, Ala.R.App.P.
In its sentencing order, the trial court made the following findings of fact regarding the aggravating circumstance that the offense was especially heinous, atrocious, or cruel:
"The especially heinous, atrocious, or cruel aggravating circumstance exists in that the victim, twelve-year-old William Brett Bowyer and his father were handcuffed and transported to the vicinity and then to the ultimate murder scene not once but twice. The child was in the proximity while the defendant and his accomplice attempted to kill the child's father by cutting his throat. The child pleaded `please don't hurt my daddy,' only to be told by the defendant that he had better start worrying about what's going to happen to him and not his daddy. The defendant told Forest F. (Butch) Bowyer that he was going to enjoy slitting Bowyer's son's throat in front of him. At the scene, the accomplice told the defendant, `I've done one, now you do one.' The defendant shot the child in the head. The child, after being shot once in the head, started making gurgling noises. The defendant remarked, the little M-F doesn't want to die,' and shot him twice more. The accomplice repeatedly taunted the child's father by telling him to lie down and go to sleep and that he (the accomplice) was the only hope that the father had of his son not being harmed. The defendant and his accomplice laughed and joked as they buried the dead child and his father.
"The manner in which twelve (12) year old William Brett Bowyer was murdered and the mental terror and torture inflicted on the mind of this child raise this crime to a conscienceless and pitiless crime which was unnecessarily torturous to the twelve (12) year old victim and, therefore, fell into the category of *417 especially heinous, atrocious, or cruel compared to other capital offenses."
(C. 88-89.)
The aggravating circumstance that the offense was especially heinous, atrocious, or cruel "was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981). In Ex parte Clark, 728 So.2d 1126 (Ala.1998), the Alabama Supreme Court explained:
"In Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court of the United States held that the application of certain state death penalty statutes violated the Eighth Amendment to the United States Constitution as applied to the states through the Due Process Clause of the Fourteenth Amendment. The Supreme Court held that those statutes' lack of principled standards to prevent the sentencing authority from arbitrarily and capriciously imposing capital punishment rendered the application of the sentencing scheme constitutionally infirm. E.g., id. at 310, 92 S.Ct. 2726 (Stewart, J., concurring); id. at 311, 92 S.Ct. 2726 (White, J., concurring).
"Since Furman, many states have revised their death penalty statutes to require that the sentencing authority consider aggravating and mitigating circumstances, thus limiting the discretion of the sentencing authority. See Maynard v. Cartwright, 486 U.S. 356, 362, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The Supreme Court's postFurman cases make it clear that to survive Eighth Amendment scrutiny, a factor used as an aggravating circumstance in a capital punishment statute must provide a `principled way to distinguish' cases in which the death penalty is appropriate from cases in which it is not. See, e.g., Godfrey v. Georgia, 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). The Supreme Court has held that the `especially heinous, atrocious, or cruel' aggravating circumstance provides such a principled distinction only where the state appellate courts employ a consistent and narrow interpretation of that circumstance to channel the discretion of the sentencer. See Cartwright, 486 U.S. at 365-66, 108 S.Ct. 1853 (upholding the Oklahoma Court of Criminal Appeals' interpretation of the `especially heinous, atrocious, or cruel' aggravating circumstance to require, before a death sentence is imposed, a finding that the victim was tortured or was caused to suffer serious physical abuse).
"In Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989), the United States Court of Appeals for the Eleventh Circuit upheld this Court's application of the `especially heinous, atrocious or cruel' aggravating circumstance because this Court's application of it provided a `principled way to distinguish' cases in which the death penalty is appropriately imposed from cases in which it is not. Id. at 1513, 1515 (upholding our application of Ala.Code 1975, § 13A-5-49(8) and quoting Godfrey, 446 U.S. at 431, 100 S.Ct. 1759). The Eleventh Circuit emphasized that the Alabama appellate courts' interpretation of § 13A-5-49(8) passed muster under the Eighth Amendment because this Court and the Court of Criminal Appeals had consistently defined especially heinous, atrocious or cruel' to include only `those Conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Lindsey v. Thigpen, at 1514 (quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981)) (emphasis added).
". . . .
*418 " . . . The State urges us to hold that the `execution-style' murder in this case, for which the record does not reflect torture of the victim, is nonetheless `especially heinous, atrocious or cruel.' Such an expansion of the aggravating circumstance set out in § 13A-5-49(8) to encompass a murder not involving torture, merely because the State labels the murder an `execution-style' slaying would abandon the very interpretation that the Eleventh Circuit held critical to the constitutional application of that aggravating circumstance. Indeed, the Supreme Court of the United States has held that a state supreme court's failure to apply its previously recognized limiting construction of an aggravating circumstance, which required a finding of torture or aggravated battery of the victim, rendered the application of the aggravating circumstance unconstitutional. Godfrey, 446 U.S. at 429, 432, 100 S.Ct. 1759.
"We cannot depart from the established meaning of the words enacted by the Legislature`especially heinous, atrocious or cruel'and apply those words to include murders that do not involve the infliction of torture on the victim. Such a departure would abandon the essential characteristic that made our previous applications of § 13A-5-49(8) compatible with the Eighth Amendment. We are bound to retain the interpretation of `especially heinous, atrocious or cruel' that has provided a consistent and principled distinction between those murders for which the death sentence is appropriate and those for which it is not. See Cartwright, 486 U.S. at 363, 108 S.Ct. 1853; Godfrey, 446 U.S. at 433, 100 S.Ct. 1759."
728 So.2d at 1137-41 (some emphasis in original; some emphasis added; footnotes omitted).
There are three factors generally recognized as indicating that a capital offense is especially heinous, atrocious, or cruel: (1) the infliction on the victim of physical violence beyond that necessary or sufficient to cause death; (2) appreciable suffering by the victim after the assault that ultimately resulted in death; and (3) the infliction of psychological torture on the victim. See Norris v. State, 793 So.2d 847 (Ala.Crim.App.1999). In this case, there was no physical violence beyond that necessary to cause Brett Bowyer's death, nor can we say, based on the evidence, that Brett Bowyer suffered appreciably after he was shot.[12] However, the trial court based its, finding of this aggravating circumstance not on the physical aspect of the crime, but on the psychological torture endured by Brett Bowyer.
In Norris v. State, 793 So.2d 847 (Ala. Crim.App.1999), this Court explained:
"A third factor that is considered especially indicative of `especially heinous, atrocious or cruel' is the infliction of psychological torture. Psychological. torture can be inflicted by `leaving the victim in his last moments aware of, but helpless to prevent, impending death.' [Thomas M.] Fleming, [Annot., Sufficiency of Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that Murder Was Heinous, Cruet, Depraved, or the Like-Post-Gregg Cases, 63 A.L.R.4th 478,] 492-93 [§ 2[b] (1988) 1. `Thus, mental suffering may be found where a victim witnesses the murder of another (particularly a family member) and then *419 realizes that soon he or she will also be killed, as well as where the victim is expressly taunted with the prospect of his or her own death.' Id. at § 2[b], at. 493 (footnotes omitted).
"Alabama courts have recognized that the psychological torture inflicted by a victim's witnessing the death of a family member can be a factor making his subsequent death especially heinous, atrocious, or cruel. See, e.g., Ex parte Ford, 515 So.2d [48,] 52 [(Ala.1987)] (in determining that evidence established that a murder committed during a burglary was especially heinous, atrocious, or cruel, the Court noted, among other circumstances, that the 74-year-old victim `watched helplessly as Ford killed her daughter. . . . [and] then turned on [her], killing her in much the same fashion'); Bui v. State, 551 So.2d 1094, 1109 (Ala. Cr.App.1988) (in finding that the evidence supported the trial court's finding that the multiple murders of three siblings by their father were especially heinous, atrocious, or cruel, the court noted, 'One can only imagine the torture each child experienced by watching their father methodically cut the throats of each of them in the presence of the others and to allow them to slowly and painfully bleed to death.'), aff'd, 551 So.2d 1125 (Ala.1989), vacated on other ground, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); Godbolt v. State, 546 So.2d 982, 991 (Ala.Cr.App. 1986) (the trial court, in support of its finding that the robbery-murder was especially heinous, atrocious, or cruel, noted that one of a `combination of factors [that] sets this capital felony apart from other intentional killings' was that the victim `witnessed the killing of his wife immediately prior to his demised), remanded on other ground, 546 So.2d 991 (Ala.1987). Cf. Price v. State, 725 So.2d 1003 (Ala.Cr.App.1997) (in finding the evidence sufficient, the court noted that `[the robbery-murder victim] also apparently witnessed the attack on [his wife] or the results of that attack'); Woodall v. State, 730 So.2d 627 (Ala.Cr.App.1997) (in finding the evidence sufficient, the court noted that the 81-year-old victim in a murder for hire watched helplessly as the defendant shot the victim's youngest son).
". . . `[E]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel.' Ex parte Rieber, 663 So.2d 999, 1003 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).
"`[G]enerally reasoning that the victims were already fearful for their lives when the fatal injuries were inflicted . . ., the courts in many cases have held the proof sufficient to establish as a statutory aggravating circumstance that the murder was especially heinous, cruel, depraved, or the like, even though the victim lost consciousness or died from gunshot wounds instantly, within a few seconds or minutes, or otherwise without a time lapse deemed significant by the court, and without suffering other physical injury.'
"Fleming, supra § 2[a], at 489-90. As with the first two factors discussed (repeated infliction of injuries and appreciable suffering after a swift assault), we find that the factor of psychological torture must have been present for an appreciable lapse of time, sufficient enough to have caused prolonged or appreciable suffering, i.e., the period of suffering must be prolonged enough to separate the crime from `ordinary' murders for *420 which the death penalty is not appropriate."
793 So.2d at 859-60.
Here, Brett Bowyer was taken from his home as he was preparing for bed, handcuffed, placed in the backseat of a vehicle, and transported to a remote and isolated location. He was then transported back to his home briefly, where his father was taken inside the home, during which time he was undoubtedly unaware of what was happening to his father. He was then taken back to the remote location with his father. Although the testimony was unclear as to whether Brett witnessed Brooks and Carruth slit his father's throat, the evidence was clear that Brett saw his father lying on the ground bleeding. Brett begged Brooks and Carruth not to hurt his father, and he was told to worry about himself. He was then taken to stand over his own grave before he was shot. We have no doubt that Brett Bowyer, although only 12 years old, understood the gravity of the situation throughout the ordeal, and as he stood over his own grave with his father lying bleeding only yards away, he knew that his death was imminent. As the trial court noted, it is this type of prolonged and appreciable psychological suffering that elevates this crime to one that is especially heinous, atrocious, or cruel when compared to other capital offenses.
Moreover, contrary to Brooks's contention, the trial court did not erroneously rely on acts committed against Forest Bowyer in determining that the offense was especially heinous, atrocious, or cruel. "As noted above, only if the crime is conscienceless or pitiless and unnecessarily torturous to the victim can it be considered especially heinous, atrocious, or cruel." Clark v. State, 896 So.2d 584, 648 (Ala. Crim.App.2000). Although the acts and remarks made by Brooks and Carruth that were not witnessed by Brett Bowyer such as Brooks's taunting Forest Bowyer with the threat of slitting Brett's throat, and Brooks and Carruth's laughing and joking as they were burying Forest and Brett Bowyer after Brett's deathwere not relevant in determining whether the crime was unnecessarily torturous to Brett Bowyer, these facts were certainly relevant and probative of whether the crime was conscienceless and pitiless.
Accordingly, we find no error, much less plain error, in the trial court's instructing the jury on, and in finding the existence of, the aggravating circumstance that the murder of Brett Bowyer was especially heinous, atrocious, or cruel.

VIII.
Brooks contends that lethal injection constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. Brooks did not raise this claim in the trial court; therefore, we review it under the plain-error rule. See Rule 45A, Ala. R.App.P. In Bryant v. State, 951 So.2d 732 (Ala.Crim.App.2003) (opinion on return to remand), this Court rejected this same argument:
"We note that Alabama's statutory death-penalty scheme has repeatedly been upheld against constitutional challenges. A comprehensive listing of the cases dealing with these challenges can be found in Travis v. State, 776 So.2d 819, 873 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081 (2001). Moreover, we know of no authority in support of the general proposition that death by lethal injection violates a defendant's constitutional *421 rights.[13] Indeed, a number of jurisdictions have rejected such claims. See, e.g., Sims v. State, 754 So.2d 657, 668 (Fla.2000); State v. Carter, 89 Ohio St.3d 593, 608, 734 N.E.2d 345 (2000); Ritchie v. State, 809 N.E.2d 258, 262 (Ind.2004); Wheeler v. Commonwealth, 121 S.W.3d 173, 186 (Ky.2003).3 Today, we join these jurisdictions in holding that death by lethal injection is not per se cruel and unusual punishment.
"____
"3 Indeed, the only case we know of successfully challenging execution by lethal injection involved an inmate's individualized claim that death by lethal in jection would violate the Eighth Amendment's prohibition against cruel and unusual punishment because he suffered from collapsed veins. See Nelson v. Campbell, 541 U.S. 637 (2004). Bryant makes no such individualized claim. Thus, he is entitled to no relief on his claim that death by lethal injection constitutes cruel and unusual punishment."
951 So.2d at 747-48.
Therefore, we find no error, much less plain error, as to this claim.

IX.
In accordance with Rule 45A, Ala.R.App. P., we have examined the record for any plain error with respect to Brooks's capital-murder convictions, whether or not brought to our attention or to the attention of the trial court. Other than the defect discussed in Part IV of this opinion, we find no other plain error or defect in the proceedings during the guilt phase of the trial.
We have also reviewed Brooks's sentence in accordance with § 13A-5-53, Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving Brooks's capital-murder convictions, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Brooks of four counts of capital murder, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala. Code 1975. After hearing evidence concerning *422 the aggravating and mitigating circumstances; after being instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury unanimously recommended a sentence of death.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Brooks to life imprisonment without the possibility of parole or to death as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). In its sentencing order, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala. Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Brooks's participation in it.
In its findings, the trial court found the existence of four statutory aggravating circumstances: (1) that the murder was committed during the course of a robbery, see § 13A-5-49(4), Ala.Code 1975; (2) that the murder was committed during the course of a burglary, see § 13A-5-49(4), Ala.Code 1975; (3) that the murder was committed during the course of a kidnapping, see § 13A-5-49(4), Ala.Code 1975; and (4) that the murder was especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The trial court found the existence of one statutory mitigating circumstance: that Brooks had no significant history of prior criminal activity, see § 13A-5-50(1), Ala.Code 1975. The trial court also heard testimony and argument regarding Brooks's character and record and any of the circumstances of the offense that Brooks offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala.Code 1975. In this regard, the trial court found as nonstatutory mitigating circumstances: (1) that Brooks was "not the mastermind of this criminal endeavor" (C. 93); (2) that Brooks cooperated with law enforcement in its investigation; (3) that Brooks came from a "broken home" (C. 93); and (4) that Brooks was dependant on drugs, particularly marijuana.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the mitigating circumstances, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Brooks to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence, and we find no plain error or defect in the penalty phase of the proceedings.[14]
Brooks was convicted of murder committed during the course of a kidnapping and burglary and murder of a victim who was less than 14 years of age. These offenses are defined by statute as capital offenses. See § 13A-5-40(a)(1), (4), and (15), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Lewis v. State, 889 So.2d 623 (Ala. *423 Crim.App.2003), and the cases cited therein dealing with murders committed during a kidnapping; Hall v. State, 820 So.2d 113 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001), and the cases cited therein dealing with murders committing during a burglary; and Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004), and the cases cited therein dealing with murders of children less than 14 years of age.
After carefully reviewing the record of the guilt phase and of the penalty phase of Brooks's trial, we find no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. The findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstances outweigh the mitigating circumstances, and we agree that death is the appropriate sentence in this case. Considering the crime committed and Brooks, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.

X.
Based on the foregoing, we affirm Brooks's convictions for capital murder during a kidnapping, capital murder during a burglary, and capital murder of a child less than 14 years of age and his sentence of death. We likewise affirm Brooks's convictions and sentences for attempted murder and robbery. However, we reverse Brooks's convictions for capital murder during a robbery and for burglary, and we remand this case for the trial court to vacate those convictions.
OPINION OF JUNE 30, 2006, WITHDRAWN; OPINION SUBSTITUTED; APPLICATIONS OVERRULED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
McMILLAN and WISE, JJ., concur. BASCHAB, P.J. concurs in part and dissents in part, with opinion.
BASCHAB, Presiding Judge, concurring in part and dissenting in part.
I do not agree with the majority's conclusions that the appellant's robbery-murder conviction must be reversed; that his first-degree robbery conviction need not be reversed on double jeopardy grounds; and that the trial court erred in instructing the jury that the robbery-murder conviction established beyond a reasonable doubt the aggravating circumstance that the appellant committed the murder during the course of a robbery. The trial court made an isolated statement during its guilt-phase jury instructions defining the offense of robbery-murder that the victim of the robbery was Brett, rather than Forest, who was named in the indictment. This was clearly just a "slip of the tongue"a misstatement of the facts rather than the law. In its preliminary jury instructions, the trial court properly identified Forest as the victim of the robbery when it read the indictment to the jury. Also, the entire presentation of the evidence was premised on the fact that Forest was the victim of the robbery.
"Even if the instructions given by the judge did misstate the [facts], the instructions would constitute harmless error because the giving of these instructions could have had no effect on the outcome of the appellant's conviction. As this Court stated in Crowder v. State, 476 So.2d 1241, 1243 (1985):
"`The giving of an erroneous instruction is not ground for reversal where it could not in any manner have prejudiced the accused. Dennis v. State, 118 Ala. 72, 23 So. 1002 (1898).'" *424 Hill v. State, 721 So.2d 249, 253 (Ala.Crim. App.1998). In this case, it was overwhelmingly evident to the jury that Forest, rather than Brett, was the victim of the robbery. The trial court's misstatement in this regard could not in any manner have prejudiced the appellant and did not constitute plain error, i.e., "error [that] has or probably has adversely affected the substantial right of the appellant," Rule 45A, Ala. R.App. P., or any type of truly jurisdictional error. Accordingly, I respectfully dissent as to those parts of the majority opinion that reverse the appellant's robbery-murder conviction; leave intact the appellant's first-degree robbery conviction; and conclude that the trial court erred in instructing the jury that the robbery-murder conviction established beyond a reasonable doubt the aggravating circumstance that the appellant committed the murder during the course of a robbery.
NOTES
[1] Carruth was also convicted of attempted murder, robbery, burglary, and four counts of capital murder and was sentenced to death. This Court affirmed Carruth's capital-murder convictions and sentence of death, as well as his conviction and sentence for attempted murder; this Court reversed Carruth's convictions and sentences for robbery and burglary. See Carruth v. State, 927 So.2d 866 (Ala.Crim.App.2005).
[2] This Court may consider both the evidence at the suppression hearing and at trial in determining whether the denial of a motion to suppress was proper. See, e.g., Ex parte Price, 725 So.2d 1063 (Ala.1998).
[3] The crime occurred in Russell County; Brooks's motion for a change of venue was granted, and the case was transferred to Talladega County for trial.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] For purposes of trial, the videotape was redacted to remove those portions in which Brooks discussed an unrelated crime in Lee County. However, the record indicates that the trial court, in ruling on the suppression issue, viewed the unredacted videotape. Although the unredacted videotape was not formally introduced into evidence at the suppression hearing, during oral argument both parties requested that we view the unredacted tape. We have done so for purposes of the suppression issue only.
[6] Brooks's argument in this regard is two sentences long and, although he lists the exhibit numbers about which he complains, he fails to identify those exhibits or to make any argument regarding why he believes those particular exhibits were inadmissible. We do not condone Brooks's mere citation of exhibit numbers with no discussion or argument, and we consider it to be an indication of the lack of merit of the contention. See, e.g., Hardy v. State, 804 So.2d 247, 289 (Ala.Crim.App. 1999) ("We in no way condone a party's reliance on the mere citing of page numbers from the record, without a discussion of the pertinent facts from those pages and application of the pertinent law to those facts. We consider such reliance an indication of a lack of merit of the contention the party asserts."), aff'd, 804 So.2d 298 (Ala.2000). Nevertheless, because this case involves the death penalty, we review the propriety of the admission of these exhibits.
[7] Although the indictment did not allege the specific crime Brooks intended to commit inside the dwelling, see, e.g., Lanier v. State, 733 So.2d 931, 936 (Ala.Crim.App.1998), and Popwell v. State, 480 So.2d 41, 45 (Ala.Crim.App. 1985) (both holding that a burglary indictment must allege the specific crime the accused intended to commit within the dwelling), the trial court amended the indictment during its jury instructions when it instructed the jury that to find Brooks guilty of capital murder during a burglary it had to find that Brooks intended to commit the crime of theft inside the dwelling. See, e.g., Ash v. State, 843 So.2d 213 (Ala.2002) (a trial court can amend an indictment through its jury instructions), overruled on other grounds, Ex parte Seymour, 946 So.2d 536 (Ala.2006); Carruth v. State, 927 So.2d 866 (Ala.Crim.App.2005) (upholding amendment to indictment charging capital murder during a burglary to add the element of the crime the defendant intended to commit inside the dwelling); and Hampton v. State, 815 So.2d 571 (Ala.Crim. App.2001) (holding that an indictment that fails to charge a mens rea element but otherwise validly charges a crime may be amended to add the mens rea element).
[8] In Ex parte Seymour, the Alabama Supreme Court overruled Ash to the extent that it held that an indictment is the source of a trial courts subject-matter jurisdiction.
[9] Even when arguing the elements of capital murder during a robbery, the prosecutor did not specifically delineate who was the victim of the robbery, but implied that Brett Bowyer was the victim. The prosecutor stated: "If you use force against a person to overcome their resistance, and you're armed with a deadly weapon or a dangerous instrument or, you cause an injury, you're guilty of robbery. Did they use force? Yes; deadly force. Did they cause injury? Of course." (R. 1573; emphasis added.)
[10] Brooks includes within this argument the fact that Brett Bowyer was under the age of 14 years at the time of his death. However, the record reflects that the trial court did not instruct the jury that the fact that Brett Bowyer was under the age of 14 years was an aggravating circumstance nor did it find this fact to be an aggravating circumstance.
[11] Brooks also argues that the trial court erred in treating the fact that Brett Bowyer was under the age of 14 years at the time of his death as both an element of the "capital offense and as an aggravating circumstance. However, as explained in note 10, supra, the fact that Brett Bowyer was under the age of 14 years was not considered as an aggravating circumstance.
[12] In her videotaped deposition, Dr. Herawi testified that Brett Bowyer was probably rendered unconscious by the first shot to his head, and that, although she could not say for certain, it was unlikely that he felt any pain after he lost consciousness.
[13] Since our decision in Bryant, the United States District Court for the Northern District of California has held that. California's lethal-injection protocol, "as actually administered in practice," violates the Eighth Amendment. See Morales v. Tilton, 465 F.Supp.2d 972, 974 (N.D.Cal.2006). That holding, however, is not binding on this Court; it was made after five days of formal hearings, including a trip by the judge who issued the ruling to the California execution chamber; and it involved the specific manner in which lethal injection was administered in the state of California, including, but not limited to, the chemicals used, the training and supervision of the execution team, the design of the execution chamber, and the maintenance of records and logs of executions.
[14] See Part V of this opinion.